# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

      **v.**                             **Case Nos.**    **06-20034-01-JWL**

**LOLESTER MITCHELL,**

      **Defendant.**

_____

## MEMORANDUM AND ORDER

The superseding indictment in this case charges defendant Lolester Mitchell with twelve counts relating to Mr. Mitchell's alleged acquisition and possession of firearms. This matter is before the court on his motion and amended motion to suppress statements (docs. #38 & #41). The court held an evidentiary hearing on the motions on October 12, 2006. After thoroughly considering the parties' arguments and the evidence, the court will largely deny the motion, but will grant it in part. Specifically, the court will grant the motion with respect to Mr. Mitchell's statement, made in response to the investigating officers' inquiry on February 14, 2006, when they asked him if he would be interested in talking to them about the firearm investigation, that "he didn't have anything to say." The motion is denied in all other respects.

I.      **Background**

On February 14, 2006, Mr. Mitchell was taken into custody on active warrants unrelated to the firearm charges at issue in this case.  William Johnson, a detective with the Kansas City, Kansas, Police Department assigned to the ATF task force, went to the Wyandotte County jail to attempt to interview Mr. Mitchell in connection with his involvement in the purchase of the firearms at issue here.  Detective Johnson and Special Agent Mackey with ATF escorted Mr. Mitchell into the DUI room where DUI drivers are processed.  The officers introduced themselves, told Mr. Mitchell they were investigating the firearms, and asked him if he would be interested in talking to them about that.  Mr. Mitchell responded that "he didn't have anything to say."  Mr. Mitchell then began asking questions about "why [they] were interested in him in regards to the firearms" and "began to make statements that he didn't possess the firearms, they were his cousin's, things like that."  Up to this point, after Mr. Mitchell had told them he had nothing to say, they had not asked him any questions.

The officers then asked Mr. Mitchell if he would consent to a DNA sample.  Mr. Mitchell declined and "said that he knows about how DNA works and that – I quote, they already tried to get me for killing some dude because they got my DNA on the steering wheel, unquote."  Regarding the issue of whether he actually touched the guns, Mr. Mitchell said "of course my DNA's going to be on the guns or something to that effect."  He also made some comment about how he had never touched the "AK47-type rifle as it was still sealed in the box."  He also "said something to the effect of if [he] would have known [he]

2

was dirty or thought [he] was dirty then [he] would have run from the police because [he] always run[s] from the police." Detective Johnson told Mr. Mitchell that he was going to seek a search warrant and that he would probably see him in the next couple of days.

On February 16, 2006, Detective Johnson returned with a search warrant to obtain a DNA sample from Mr. Mitchell. He decided to audiotape his execution of the warrant because he "knew that Mr. Mitchell was probably going to have a lot to say." He made contact with Mr. Mitchell, asked if Mr. Mitchell remembered him, told Mr. Mitchell that he had a warrant for a DNA sample, and provided Mr. Mitchell with a copy of the warrant. The two began discussing the actual obtaining of the sample; Mr. Mitchell's first response was that he was not going to give a DNA sample. He then became agitated and started asking questions of Detective Johnson. A dialogue ensued; according to Detective Johnson's testimony, he believed that during that conversation he was just trying to accommodate Mr. Mitchell by answering those questions.

Mr. Mitchell now asks the court to suppress statements he made during the jail interview on February 14, 2006, and during execution of the DNA search warrant on February 16, 2006. It is undisputed that Mr. Mitchell was not given *Miranda* warnings during either encounter.

**B.**   **Analysis**

*1.   The Initial Encounter at the Jail on February 14, 2006*

Turning first to the officers' initial inquiry on February 14, 2006, when they told Mr. Mitchell they were investigating the firearms and asked him if he would be interested in talking to them about that, the court will suppress Mr. Mitchell's response on the grounds that *Miranda* warnings were required because the officers were attempting to conduct a custodial interrogation.  The protections of *Miranda* apply only when an individual is subject to "custodial interrogation."  *United States v. Rogers*, 391 F.3d 1164, 1169 (10th Cir. 2004). The government does not dispute Mr. Mitchell's argument that the encounter was "custodial" for *Miranda* purposes, even though he was in custody on an unrelated charge.[1]  Mr. Mitchell was subjected to "interrogation" to the extent that the officers subjected him to questioning or any other words or actions they should have known were reasonably likely to elicit an incriminating response from him.  *United States v. Rambo*, 365 F.3d 906, 909 (10th Cir. 2004) (quoting *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)).  The test of whether an interrogation has occurred is an objective one.  *Id.*  The focus is on the perceptions of a reasonable person in the suspect's position, not on the intent of the investigating officer.  *Id.*

---

[1] A finding that the encounter was not "custodial" for *Miranda* purposes would require the court to conduct an inquiry dependent on facts which are not currently revealed by the record.  *See generally, e.g.*, *United States v. Chamberlain*, 163 F.3d 499, 502-04 (8th Cir. 1998) (discussing the legal standard for whether interrogation of a person already in prison on another matter is "custodial" for purposes of requiring *Miranda* warnings); *United States v. Menzer*, 29 F.3d 1223, 1230-33 (7th Cir. 1994) (same); *United States v. Conley*, 779 F.2d 970, 972-74 (4th Cir. 1985) (same).

In this case, the officers' initial inquiry of Mr. Mitchell—when they told him they were investigating the firearms and asked him if he would be interested in talking to them about that—was reasonably likely to elicit an incriminating response from him and therefore constituted interrogation. Because this interrogation was unwarned, the court will suppress Mr. Mitchell's response to this question in the prosecution's case-in-chief.

The next statements made by Mr. Mitchell, however, were unsolicited by the officers' initial inquiry regarding whether Mr. Mitchell would be interested in talking to them about their investigation of the firearms. After Mr. Mitchell told the officers he had nothing to say, he then began asking them questions about "why [they] were interested in him in regards to the firearms" and "began to make statements that he didn't possess the firearms, they were his cousin's, things like that." The "fruit of the poisonous tree" doctrine does not operate to automatically require suppression of these subsequent statements. *United States v. Pettigrew*, — F.3d —, 2006 WL 2946893, at *4-*6 (10th Cir. Oct. 12, 2006). Rather, "the admissibility of an unsolicited inculpatory statement, following a voluntary statement made in violation of *Miranda*, turns on whether the inculpatory statement was knowingly and voluntarily made." *Id.* at *6. The court considers whether his statements were voluntary based on a totality of the circumstances. *Id.* at *8. If the statement is the product of an essentially free and unconstrained choice by the maker, it may be used against him. *Id.* But, if his will was overborne and his capacity for self-determination critically impaired, then the use of the statement offends due process. *Id.* In making this determination the court examines the surrounding circumstances and the entire course of police conduct. *Id.* Here, the evidence

5

reflects that these statements were voluntarily made by Mr. Mitchell. Once Mr. Mitchell told the officers he had nothing to say, they did not ask him any further questions. Although he told them he had nothing to say, he clearly did not evidence an intent to act on that statement because he immediately began making statements about the investigation. Because these statements appear to have been the result of a free and unconstrained choice by Mr. Mitchell, then, the court will not suppress these statements.

The next statement made by the officers which arguably constituted further interrogation in violation of *Miranda* was when they asked Mr. Mitchell if he would consent to a DNA sample. Mr. Mitchell contends that the court should suppress the statements following this request on the grounds that, because he had previously told the officers he had nothing to say, he had invoked his right to remain silent and the officers were required to cease all questioning of him. This argument is without merit for two reasons.

First, Mr. Mitchell did not invoke his right to remain silent. To determine if he initially invoked this right, the court examines the "entire context of the relevant statement" for a "clear and unambiguous assertion" of the right to remain silent. *Rambo*, 365 F.3d at 910. The suspect's invocation of the right must have been sufficiently clear that a reasonable law enforcement officer in the circumstances would have understood the statement to be an invocation of the right to remain silent. *United States v. Nelson*, 450 F.3d 1201, 1212 (10th Cir. 2006). In this case, Mr. Mitchell stated he "didn't have anything to say," but then proceeded to ask the officers questions and make voluntary statements. Taken in context, then, his statement was not a clear and unambiguous assertion that a reasonable law

6

enforcement officer would have understood as Mr. Mitchell invoking his right to remain silent.

Second, the officers' request for a DNA sample did not constitute interrogation under *Miranda*.   *Miranda*'s protection of a person's Fifth Amendment right against self-incrimination only protects against compelled testimonial communications.  *Fernandez v. Rodriquez*, 761 F.2d 558, 568 (10th Cir. 1985) (Logan, J., concurring); *see also Lucero v. Gunter*, 17 F.3d 1347, 1350 (10th Cir. 1994) (citing *Fisher v. United States*, 425 U.S. 391, 408-09 (1976)).   Thus, a suspect normally has no Fifth Amendment right against being compelled to provide physical evidence.  *Fernandez*, 761 F.2d at 568.  The right therefore does not apply where the suspect is not being forced to communicate information or testimony, such as when the suspect gives blood, handwriting, and voice samples and exemplars.  *Fisher*, 425 U.S. at 408.  Consequently, a request for such evidence does not constitute interrogation within the meaning of *Miranda*.  *See South Dakota v. Neville*, 459 U.S. 553, 564 n.15 (1983) (noting that "a police inquiry of whether the suspect will take a blood-alcohol test is not an interrogation within the meaning of *Miranda*"); *United States v. Elmo*, 140 F.3d 1289, 1293 (9th Cir. 1998) (same, request for urine sample); *United States v. Daughenbaugh*, 49 F.3d 171, 174 (5th Cir. 1995) (same, request for handwriting sample); *cf. Lucero*, 17 F.3d at 1350 (affirming district court's dismissal of a civil claim in which inmate claimed that a request for a urine sample violated his Fifth Amendment right against self-incrimination).  Consequently, the court will not suppress Mr. Mitchell's statements following the officers' request for a DNA sample.  These statements were not responsive to

any interrogation by the officers, but rather were spontaneous and voluntary statements initiated by Mr. Mitchell.

2.   *The Second Encounter on February 16, 2006*

The next encounter occurred on February 16, 2006.  The court has carefully reviewed the recording of the conversation that occurred during this encounter and finds that Mr. Mitchell was not subjected to interrogation in violation of *Miranda*.  Again, the legal standard for what constitutes "interrogation" for *Miranda* purposes is whether the suspect was subject to questioning or any other words or actions that the officers should have known were reasonably likely to elicit an incriminating response from him, an objective test focusing on the perspective of a reasonable person in the suspect's position.  *Rambo*, 365 F.3d at 909.  Viewed from Mr. Mitchell's perspective, Detective Johnson's statements during the encounter are most accurately characterized as having been made either in an attempt to execute the search warrant by collecting a DNA sample and/or in responding to Mr. Mitchell's questions and statements.  Insofar as Detective Johnson's statements pertain to his efforts to collect the DNA sample, as with the officers' request for a DNA sample from Mr. Mitchell two days prior, again, Detective Johnson's statements did not constitute interrogation.  And, insofar as Detective Johnson was responding to Mr. Mitchell's questions and statements, the evidentiary record reflects that, if any interrogation occurred during the encounter, it was Detective Johnson being interrogated by Mr. Mitchell, not the other way around.

8

Mr. Mitchell nonetheless contends that the encounter constituted an interrogation that was a "textbook application" of *Rhode Island v. Innis*, 446 U.S. 291 (1980).  He argues that this encounter was a psychological ploy that was the functional equivalent of interrogation.  According to Mr. Mitchell, the officers were taking a statement by means of subterfuge because they were surreptitiously recording the conversation and there was a lot of conversation going on with an expectation that someone (himself) who generally was over-responsive was going to respond in a fashion that could be used against him at trial.  The court finds this argument to be without merit.  The evidence at the suppression hearing does not reflect that the warrant to collect Mr. Mitchell's DNA was a drummed-up guise to obtain a tape-recorded confession from him.  The officers had already asked Mr. Mitchell for a DNA sample two days prior, which he had refused.  Although Mr. Mitchell contends that they already had a DNA sample from him, the sample to which Mr. Mitchell was presumably referring is the one collected by the Kansas Department of Corrections for all convicted felons.  Detective Johnson testified that there is no chain of custody on those samples and therefore they are not admissible in court.  Consequently, they needed a new DNA sample from which they could legitimize, or preserve, a chain of custody.  Law enforcement officers did not swab the firearms and submit those samples along with Mr. Mitchell's sample for DNA testing because, ultimately, they were able to obtain information that Mr. Mitchell had actually possessed the firearms from Mr. Mitchell and other sources.  According to Detective Johnson, because of the caseload and the cost associated with DNA testing, if law enforcement officers "can make a case through other evidence without the DNA testing,

that's what [they] do."  Having had a legitimate reason to collect the DNA, then, the court does not believe that in this case Detective Johnson's collection of the DNA was the type of psychological ploy that was the functional equivalent of police interrogation with which the Supreme Court was concerned in *Innis*.

To the contrary, this case falls under the Supreme Court's holding in *Arizona v. Mauro*, 481 U.S. 520 (1987).  In *Mauro*, the Court held that permitting a person in custody to enter a situation in which law enforcement officers are aware that there is a possibility that the suspect may make an incriminating statement is insufficient to establish the functional equivalent of interrogation.  *Id.* at 528-30.  The Court noted that "[o]fficers do not interrogate a suspect simply by hoping that he will incriminate himself."  *Id.* at 529.  As the Court summed up its decision, the defendant in *Mauro* "was not subjected to compelling influences, psychological ploys, or direct questioning.  Thus, his volunteered statements cannot properly be considered the result of police interrogation."  *Id.*  The same reasoning applies here.  From Mr. Mitchell's perspective, Detective Johnson had merely come to collect a DNA sample from him.  The numerous volunteered numerous statements made by Mr. Mitchell during that encounter were not the result of any compelling influences, psychological ploys, or direct questioning by Detective Johnson.  *Cf. Siripongs v. Calderon*, 35 F.3d 1308, 1319-20 (9th Cir. 1994) (surreptitious recording of telephone call in jail by corrections officer standing nearby with a hidden recorder did not violate inmate's rights because his statements were not uttered in response to any interrogation).

10

Accordingly, Mr. Mitchell's motion to suppress is denied almost in its entirety.  It is granted only to the extent that, in response to the officers' inquiry on February 14, 2006, when they asked him if he would be interested in talking to them about the firearm investigation, he responded that "he didn't have anything to say."

**IT IS THEREFORE ORDERED BY THE COURT** that defendants' motion and amended motion to suppress (docs. #38 & #41) are granted in part and denied in part as set forth above.

**IT IS SO ORDERED** this 8th day of November, 2006.

s/ John W. Lungstrum
John W. Lungstrum
United States District Judge